UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| FIREROCK GLOBAL OPPORTUNITY FUND LP, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No. 1:15-cv-03813-MSS-SF |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) | |
| | ) | Judge Manish S. Shah |
| vs. | ) | |
| | ) | |
| RUBICON TECHNOLOGY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Firerock Global Opportunity Fund LP ("plaintiff") makes the following allegations based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Rubicon Technology, Inc. ("Rubicon" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by or about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Rubicon common stock in the Company's public offering on or about March 19, 2014 ("March 2014 Offering") (the "Class"), seeking to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act").

## PARTIES

2.      Plaintiff Firerock Global Opportunity Fund LP purchased Rubicon common stock in the March 2014 Offering, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

3.      Defendant Rubicon is a vertically integrated, advanced electronic materials provider specializing in monocrystalline sapphire. Rubicon maintains its executive offices in Bensenville, Illinois.

4.      Defendant Raja M. Parvez ("Parvez") served, at all relevant times, as President, Chief Executive Officer and a Director of Rubicon.

5.      Defendant William F. Weissman ("Weissman") served, at all relevant times, as Chief Financial Officer of Rubicon. In that position, Weissman was Rubicon's Principal Financial and Accounting Officer.

- 1 -

6.    Defendant Don N. Aquilano ("Aquilano") served, at all relevant times, as Chairman of Rubicon's Board of Directors.

7.    Defendant Donald R. Caldwell ("Caldwell") served, at all relevant times, as a member of Rubicon's Board of Directors. Defendant Caldwell is the owner and managing director of Cross Atlantic Capital Partners, Inc., which is the investment manager for Co-Investment 2000 Fund, L.P. ("Co-Investment Fund") and Cross Atlantic Technology Fund II, L.P. ("Cross Atlantic Technology Fund II") (collectively referred to herein as "Cross Atlantic Funds"). According to Rubicon's SEC filings, Caldwell controls the Cross Atlantic Funds, and together, Caldwell and the Cross Atlantic Funds were at all relevant times the largest beneficial owners of Rubicon Stock. The Cross Atlantic Funds sold 2.5 million shares pursuant to the March 2014 Offering, receiving approximately $31 million in proceeds.

8.    Defendant Michael E. Mikolajczyk ("Mikolajczyk") served, at all relevant times, as a member of Rubicon's Board of Directors.

9.    Defendant Raymond J. Spencer ("Spencer") served, at all relevant times, as a member of Rubicon's Board of Directors.

10.   Defendants Parvez, Weissman, Aquilano, Caldwell, Mikolajczyk and Spencer are collectively referred to herein as the "Individual Defendants." Each of the Individual Defendants personally or through power of attorney signed the registration statement (defined below) and prospectus issued in connection with the March 2014 Offering.

11.   Defendants Canaccord Genuity Inc. ("Canaccord") and D.A. Davidson & Co. ("Davidson") served as the underwriters for the March 2014 Offering and received combined discounts and commissions of approximately $1.5 million in connection therewith.

12.   Defendants Canaccord and Davidson are referred to herein as the "Underwriter Defendants."

- 2 -

13.     The Underwriter Defendants participated in the drafting and dissemination of the defective registration statement for the March 2014 Offering.

14.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the registration statement for the March 2014 Offering was prepared properly and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

15.     Defendant Rubicon, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as "defendants."

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

17.     This Court has jurisdiction over this action pursuant to §22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §§1331 and 1337.

18.     Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  Rubicon maintains its principal place of business in this District, the acts and conduct complained of herein occurred in substantial part in this District, and the March 2014 Offering was marketed in this District.

19.     In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the Nasdaq Global Market ("NASDAQ").

## SUBSTANTIVE ALLEGATIONS

**Background**

**The Company and Its Business**

20.     Rubicon describes itself as a vertically integrated, advanced electronic materials provider specializing in monocrystalline sapphire.

21.     Sapphire is commonly used as a substrate (*i.e.*, base layer) in light emitting diode (commonly known as "LED") lighting technology.  LED lighting can be found in numerous consumer products such as light bulbs, HDTVs, tablets, computer monitors and mobile phones. According to Rubicon, LEDs "are the future of lighting" because of "their environmentally-friendly, durable and energy efficient properties."

22.     To be used in LED technology, sapphire must be fabricated and processed in a series of steps.

(a)     First, raw materials are transformed into sapphire crystal.  Rubicon uses a "proprietary crystal growth technique" to heat and subsequently cool aluminum oxide to produce sapphire crystals known as "boules":



(b)     Second, 2-inch to 8-inch sapphire "cores" are drilled from the boule:



(c)     Third, the cores are sliced and polished to create "wafers":



(d)     If desired by the LED manufacturer, a specific pattern designed to optimize lighting can be etched onto the wafer.

(e)     Finally, the wafer is cut into small chips, which serve as the substrate in the LED component.  Six-inch wafers have less curvature and consequently more surface area from which chips can be cut than their 2-inch and 4-inch counterparts.  Specifically, a 6-inch wafer will produce 10-12 times as many chips as a 2-inch wafer, despite only having approximately 9 times more surface area.  Below is a photo from a Rubicon info-graphic illustrating the wafer's position in the final product:



23.     Rubicon sells sapphire to LED manufacturers at various stages in the process, depending on how much finishing the customer does on its own.  For example, one LED manufacturer may purchase cores from Rubicon and then perform the slicing, polishing and patterning itself, whereas another LED manufacturer may purchase polished wafers.

24.     Rubicon also sells sapphire cores to customers outside the LED market, particularly to manufacturers who process sapphire cores into components such as lens and home-button covers for mobile devices.

25.     Rubicon's largest product lines are (1) 2- and 4-inch sapphire cores and (2) 6-inch polished wafers.  The Company also sells "optical sapphire components in various shapes and sizes" used in a variety of markets and applications, including jet fighter and commercial jet windows, transparent military armor, medical devices and semiconductors.   Sales of optical sapphire components accounted for approximately 10% ($4.5 million) of the Company's 2013 revenues.

26.     Rubicon is dependent on a limited number of customers.  In 2012 and 2013, the Company's two largest customers accounted for approximately 67% and 44% of total revenues, respectively.  Rubicon works closely with its customers to optimize its products with its customers' processes and applications.

**Rubicon's Collapse in 2012 and Rebound in Mid-2013**

27.     In 2010, Rubicon's business was performing well and Rubicon stock was trading above $30 per share.   In 2011 and 2012, Rubicon's business was challenged by increased competition from other manufacturers and alternative products, and its revenues began to sharply decline.  Rubicon's reversal of fortune was reflected in the steadily declining price of Rubicon stock.

28.     On February 20, 2013, Rubicon issued a press release announcing its financial results for 2012, the year ended December 31, 2012.  The Company reported a fourth quarter loss, weakening margins and first quarter 2013 earnings guidance well below analyst expectations.  The next day, Rubicon stock closed at $4.92 per share – a three year low.

29.     On May 7, 2013, Rubicon issued a press release announcing its first quarter of 2013 financial results, the period ending March 31, 2013.  The Company continued to report disappointing results.  Following the issuance of the press release, Rubicon held a conference call with analysts

- 6 -

and investors to discuss its operations and results. During that conference call, Rubicon stated, among other things, that it expected that reduced wafer sales would continue and be mitigated by increased core revenues.

30.     Rubicon, which had once been profitable, was now suffering recurring losses and investors were anxious to see Rubicon return to profitability. By mid-2013, however, Rubicon would begin reporting improving financial performance.

31.     On August 7, 2013, Rubicon issued a press release announcing its financial results for the second quarter of 2013, the period ending June 30, 2013. The Company reported a $2.3 million increase in revenues from $8.3 million to $10.6 million, $5.9 million of which was attributed to core sales and $3.3 million of which was attributable to wafer sales. According to the Company, demand for core increased markedly in the second quarter, core pricing increased by approximately 10%, and core pricing was expected to continue increasing in subsequent quarters. Rubicon further reported a gross loss for second quarter 2013 of $6.4 million, a loss from operations of $9.9 million, and a net loss of $0.26 per share.

32.     While its core business was operating at near capacity throughout 2013, Rubicon's polishing facilities were operating at significantly less than capacity due to the decrease in wafer production and sales. In 2013, in order to increase revenues, Rubicon announced that it would be providing a patterned sapphire substrates ("PSS") product line, allowing Rubicon to create and sell pre-patterned wafers to LED customers.

33.     On October 29, 2013, Rubicon issued a press release and held a conference call to announce the launch of its 4- and 6-inch PSS products. Parvez announced that "PSS wafers should generate at least $15 million in revenue for [Rubicon] in 2014," most of which would be realized in the second half of the year. Parvez explained that various companies had requested samples of Rubicon's PSS products for testing and possible qualification. In addition to PSS, the Company also

- 7 -

announced that it would begin offering 4-inch polished wafers to its customers. According to Parvez, the purpose of doing so was to increase plant utilization until the market for 6-inch wafers expanded.

34.     According to clearlysapphire.com, a website sponsored by Rubicon, "LED manufacturers go through an extensive qualification process with sapphire manufacturers to ensure that the sapphire wafers are of desired quality for the intended application. Quality is defined by . . . Flatness . . . Cleanliness . . . [and] Stress." According to Parvez, the PSS qualification cycle "will be longer than a typical polish[ed] wafer" and it "could take up to six months for a given customer to qualify."

35.     In the second half of 2013, Rubicon reported that its gross losses and losses from operations were shrinking, thereby signaling a return to profitability. Specifically, Rubicon reported stabilization and improvement in various key metrics as reflected in the table below:

| Quarter | Gross Profit (Loss) | Loss from Operations | Loss per Share |
|---|---|---|---|
| **2nd Quarter 2013** | ($6.4 million) | ($9.9 million) | ($0.26) |
| **3rd Quarter 2013** | ($6.3 million) | ($9.5 million) | ($0.26) |
| **4th Quarter 2013** | ($5.8 million) | ($9.0 million) | ($0.22)[1] |

36.     As a result of the shrinking losses and potential return to profitability, the price of Rubicon stock climbed from its earlier lows in 2013.

37.     On February 19, 2014, Rubicon issued a press release announcing its financial results for the fourth quarter of 2013, the period ending December 31, 2013. The Company reported that in

---

[1]     Rubicon reported a loss per share in accordance with Generally Accepted Accounting Principles ("GAAP") of $0.67 due to tax adjustments, but also reported a non-GAAP loss per share of $0.22 based on the removal of the tax adjustments for comparative purposes. Several analysts, similarly, reported the $0.22 number and compared it to analyst consensus expectations of $0.23.

Case: 1:15-cv-03813 Document #: 52 Filed: 07/31/15 Page 10 of 37 PageID #:341

the fourth quarter core sales accounted for $9.2 million of Rubicon's $11.5 million in total revenue. The Company attributed part of the increase in core revenues to an increase in pricing.

38.     Following the issuance of the press release, Rubicon held a conference call with analysts and investors to discuss the Company's operations and earnings. During the conference call, Weissman stated: "Given that we are at full utilization in crystal growth and core fabrication, first quarter core revenue is expected to be similar to the fourth quarter." With respect to PSS, Rubicon created and shipped "multiple samples" to nine of sixteen potential PSS customers in the fourth quarter 2013. Parvez stated that "[b]ased on the progress we have made in the past quarter, we are confident in delivering our target PSS revenue of at least $15 million in 2014." Looking forward, Parvez stated: "We will reduce the idle plant costs in the first quarter [of 2014] by at least an additional $400,000 . . . ." Weissman further explained that "[w]afer revenue will be a larger percentage of the total [revenue] in the first quarter, but there will be development costs associated with the lower volume qualification wafers and initial four-inch polished wafer orders . . . [which will] reduce margins in the near-term. However, *reduction in idle plant costs should offset most of that impact, so we expect the operating loss in the first quarter to be similar to the fourth quarter*." Thus, with the fourth quarter 2013 loss from operations having decreased to $9 million, investors were told to expect the first quarter of 2014 to have a "similar" operating loss.

39.     During the conference call, Weissman forecasted a $1.5 million increase in revenues for first quarter 2014 driven by increased wafer sales. Weissman reaffirmed the expected $400,000 reduction in idle plant costs, and further confirmed that the reduction "*should offset most of th[e] impact*" of development costs associated with producing low volumes of PSS and polished wafers and the cost of getting a 4-inch polishing line running. Thus, Weissman repeated that "gross profit will be flattish" from the fourth quarter of 2013 to the first quarter of 2014.

- 9 -

40.     During the conference call, Rubicon highlighted additional financial information which indicated that the Company's financial prospects were brightening: (i) the Company recorded $3.3 million in idle plant costs for fourth quarter 2013 which was an improvement of $600,000 from the prior quarter; and (ii) although Rubicon had noted during the October PSS announcement that development costs associated with PSS would be high, the Company's reported costs of goods sold actually decreased by almost $100,000, despite sales being higher by $400,000. Rubicon's loss per share, excluding the fourth quarter of 2013 tax adjustment, improved by $0.04 from the previous quarter, from $0.26 to $0.22.

41.     Following the issuance of the earnings release and the conference call, on February 20, 2014, the price of Rubicon stock jumped nearly 14%, from $10.80 per share to $12.28 per share, and continued to climb until reaching its highest price in the last 24 months of $14.49 per share on March 5, 2014.

**The Registration Statement for the March 2014 Offering Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

42.     On December 6, 2013, Rubicon filed with the SEC an amended shelf registration statement (the "Form S-3A"), which included a form of prospectus (the "Prospectus") authorizing the Company and to-be-identified "selling stockholders" to sell up to $100,000,000 worth of shares of Rubicon common stock, at any time, in one or more offerings. The SEC declared the Form S-3A effective on December 13, 2013.[2]

43.     On March 19, 2014, Rubicon stock was trading at $12.94 per share and Rubicon filed with the SEC a prospectus supplement (the "Prospectus Supplement"), offering to register for sale 2.5 million shares of Rubicon common stock at $13.00 per share by the Cross Atlantic Funds, which

---

[2]     On January 7, 2014, Rubicon registered to offer for sale 2.65 million shares of its common stock at a public offering price of $10.65 per share. The offering closed on January 13, 2014. In total, the Company raised $32.5 million in gross proceeds.

- 10 -

were controlled by Caldwell. In connection with the offering, Rubicon granted the Underwriter Defendants an overallotment option to purchase 375,000 shares of Rubicon common stock from the Company at $12.415 per share.

44.     The Prospectus Supplement contained the following disclosure regarding Caldwell and the Cross Atlantic Funds:

> Following the consummation of this offering, one of our directors [Caldwell], together with the affiliates he controls [Cross Atlantic Funds], who are the selling stockholders in this offering, will own in the aggregate approximately 9.7% of our outstanding capital stock and voting power . . . . For the foreseeable future, they will have significant influence over our management and affairs and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets. Their ownership may limit [other investors'] ability to influence corporate matters, and, as a result, the market price of our common stock could be adversely affected. [3]

45.     In total, the Cross Atlantic Funds received approximately ***$31 million*** in proceeds from the March 2014 Offering at inflated prices, and the Company received approximately $4.3 million in proceeds pursuant to the overallotment agreement.

46.     The March 2014 Offering was sold pursuant to the Form S-3, the Prospectus and the Prospectus Supplement (jointly referred to herein as the "Registration Statement"). The Registration Statement incorporates by reference the following documents filed with the SEC: Annual Report on Form 10-K for the year ended December 31, 2013, and Quarterly Reports on Form 10-Q for the three months ended March 31, 2013, June 30, 2013 and September 30, 2013, as well as additional SEC filings. Documents incorporated by reference are deemed to be part of the Registration Statement.

---

[3]     The Company's Form 10-K filed one month before the secondary public offering contained a disclosure with identical language, but reflected Caldwell and his affiliates' then-ownership of 21% of the Company's outstanding stock and voting power.

47.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  Specifically, the Registration Statement negligently failed to disclose material trends, events and uncertainties known to management that were reasonably expected to have a material impact on the Company's income from continuing operations, including the reversal of its trend of shrinking losses, higher-than-expected development costs and inventory write-offs due to Rubicon's inability to sell certain of its wafers during its 2014 first quarter at a prices greater than their cost to manufacture, causing such inventory to be impaired under applicable accounting rules and regulations.

48.     The Registration Statement became effective on March 19, 2014 when there were only 12 days left in the first quarter of 2014.  The Registration Statement did not provide updated financial information regarding first quarter of 2014 and instead included only its financial results and risk warnings for 2013.

49.     The Registration Statement, by incorporating by reference the stale Forms 10-Q filed in 2013 and the stale Form 10-K filed in 2014, was false and misleading in that it reflected a positive trend of  shrinking gross losses, losses from operations and losses per share, and, by reporting declining cost of goods sold between the third quarter of 2013 and the fourth quarter of 2013 despite higher sales, was false and misleading in that it reflected that the additional development costs associated with PSS would be no greater than the related reduction in idle plant costs as set forth in ¶¶39-40.

50.     The Registration Statement spoke positively about the Company's ability to control costs, stating in pertinent part as follows:

> Our fully integrated in-house capabilities enable us to maintain our high-quality standards ***while controlling costs***. . . . We have recently extended our vertical integration by introducing a patented [sic] sapphire substrate for the LED market.

51. The Registration Statement also described the Company's PSS product line, stating that the Company "recently introduced a new product offering, patterned sapphire substrates or 'PSS,'" and that the Company has "***leveraged [its] capability in producing*** larger diameter sapphire wafers to offer pre-patterned, larger diameter (four-inch and six-inch) wafers to the LED market." The Registration Statement continues: "Our vertically-integrated ***manufacturing capabilities enable us to maintain our high quality standards while controlling costs***."

52. With respect to the PSS product line, the Registration Statement stated, via incorporation of the 2013 Form 10-K, in relevant part:

> Our patterned sapphire substrates ("PSS") product line was introduced in 2013 and consists of finely polished, ultra-clean, four and six-inch patterned sapphire wafers. . . . ***We are leveraging our capability in producing*** larger diameter sapphire wafers to offer pre-patterned, larger diameter (four-inch and six-inch) wafers to the LED market. . . . During 2013, we shipped samples of four and six-inch wafers with a wide variety of pattern types, densities and heights. ***We believe this product line will generate increasing revenue in 2014***.
>
> \*       \*       \*
>
> ***We have also recently begun offering four-inch polished wafers and four and six-inch patterned wafers which we expect to generate additional wafer revenue in 2014***.

53. The Registration Statement, via incorporation of the 2013 Form 10-K, contained the following materially false and misleading purported "risk factors":

> The development of new products ***may require substantial investment in development efforts and equipment***. If our newly developed products, such as our PSS product line, do not achieve market acceptance, we may be unable to generate anticipated revenue and our operating results could be harmed.
>
> \*       \*       \*
>
> ***If our sales mix shifts to lower margin products in future periods,*** our overall gross margin levels and operating results would be adversely impacted.
>
> \*       \*       \*
>
> Developing advanced electronic materials and related products and introducing new products to the  market ***can be expensive***. We expect our research

and development expenses to increase in connection with our ongoing product research and development plans.

54.     The Registration Statement, via incorporation of the 2013 Form 10-K , also addressed the Company's accounting for inventory and Rubicon's need to write off core inventory in 2013 because it was being sold below cost without disclosing the material inventory write-offs required in first quarter of 2014, stating in pertinent part as follows:

> *We establish inventory reserves when conditions exist that suggest inventory may be in excess of anticipated demand or is obsolete based on customer required specifications*. We evaluate the ability to realize the value of our inventory based on a combination of factors, including forecasted sales, estimated current and future market value and changes in customers' product specifications. For the years ended December 31, 2013 and 2012, we determined we had inventory that was excess or obsolete and recorded an adjustment which reduced inventory and increased costs of goods sold by $604,000 and $719,000, respectively. *We also sold our smaller diameter core material at prices lower than our cost. Based on those sales prices, we recorded at December 31, 2013 and 2012 a lower of cost or market adjustment which reduced inventory and increased cost of goods sold* by $421,000 and $1.5 million, respectively. As of December 31, 2013, prices for our small diameter core products were higher than cost.

55.     The statements set forth in ¶¶49-54 were materially false and misleading for the following reasons:

(a)     The Registration Statement negligently failed to disclose material trends, events and uncertainties known to management that were reasonably expected to have a material impact on the Company's income from continuing operations, namely that Rubicon's (i) inventory had been materially impaired under applicable accounting rules and regulations due to Rubicon's inability to sell certain of its wafers during its 2014 first quarter at a prices greater than their cost to manufacture and (ii) high development costs which were not offset by a reduction in idle plant costs had caused its positive trends of shrinking losses to dramatically reverse.

(b)     As a result of the material write-off of inventory and higher development costs, the trend of shrinking losses from operations, gross losses and losses per share disclosed in the

Registration Statement had dramatically reversed during first quarter of 2014, calling into doubt the prospect of Rubicon's return to profitability, as reflected in these charts[4]:

| Quarter | Gross (Loss) | % Change | Loss from Operations | % Change | Loss per Share | % Change |
|---------|--------------|----------|----------------------|----------|----------------|----------|
| **2Q13** | ($6.4 million) | | ($9.9 million) | | ($0.26) | |
| **3Q13** | ($6.3 million) | 2% | ($9.5 million) | 4% | ($0.26) | 0% |
| **4Q13** | ($5.8 million) | 8% | ($9.0 million) | 5% | ($0.22) | 15% |
| **1Q14** | ($7.5 million) | (30%) | ($10.9 million) | (21%) | ($0.48)[5] | (118%) |



---

[4]  Black numbers reflect improvement, red numbers reflect negative trends.

[5]  The Company reported a loss per share of $0.43 which has been adjusted to $0.48 to account for the additional shares issued since the end of 2013. Notably, the May 1, 2014 press release shows the Company had approximately 22.6 million shares outstanding in 2013 and approximately 25.3 million by the first quarter of 2014.

(c)     Rubicon was losing cash from operations at a very high rate despite recording the highest revenues in a quarter since fourth quarter of 2012, as it invested in speculative PSS and wafer sales at the expense of core sales.

(d)     The Registration Statement failed to disclose that, despite reassuring statements regarding Rubicon's ability to control costs, Rubicon in fact was experiencing dramatically increasing development costs that were higher than anticipated as the Company had been forced to create as many as seven iterations of various samples for each of the sixteen prospective customers even before achieving initial qualification. Idle plant cost savings were not nearly enough to offset the increased development costs, resulting in larger losses.[6] Notwithstanding the significant effort and expense incurred, the Company had not received any PSS production orders for first quarter 2014 and had not achieved full qualification with any potential PSS customers, undermining its ability to achieve the $15 million PSS revenues target for 2014 and revealing the risky and speculative nature of the business and that its prior results would not necessarily be indicative of its future performance. Indeed, Rubicon has now disclosed that, far from the touted $15 million target, PSS revenues for all of 2014 were only about $1.1 million.[7]

(e)     The so-called "risk factors" related to PSS and wafer development costs were false and misleading in that they represented that losses due to the high development costs were merely possible when, in fact, they had already materialized. These "risk factors" only warned of

---

[6]     Weissman and Parvez claimed that PSS and 4-inch wafer development costs would be offset by reduced idle plant costs. Rubicon reduced its idle plant costs by $900,000 from fourth quarter 2013 to first quarter 2014, which was far less than the $1.8 million in reported losses attributed to PSS and wafer development costs.

[7]     On November 6, 2014, Rubicon reported $256,000 and $257,000 in PSS revenues for second quarter and third quarter 2014, respectively. On May 7, 2015, Rubicon reported $90,000 and $511,000 in PSS revenues for first quarter and fourth quarter 2014, respectively.

what might occur if certain contingencies were met; they did not make clear that such contingencies had, in fact, already manifested.

(f)    Throughout the first quarter of 2014, the Company had been selling wafers at below cost without disclosing that such sales required the Company to write off $1.1 million worth of inventory to adjust it to market value, which defendants later admitted was "material." The so-called "risk factors" in the Form 10-K related to inventory and pricing were false and misleading in that they were stale; warning only of what could happen, without disclosing that material write-offs in inventory were required to be taken in the first quarter of 2014.

56.    In addition, the Registration Statement was false and misleading because it failed to disclose material information that was required to be disclosed pursuant to the regulations governing its preparation and, as a result, was materially misleading. Specifically, the Registration Statement failed to provide information mandated by the following SEC regulations:

(a)    Item 303(a) of Regulation S-K [17 C.F.R. §229.303] required the Registration Statement to describe "*any known trend or uncertainties* that have had or *that the registrant reasonably expects will have a material* favorable or unfavorable *impact on net sales or revenues* or income from continuing operations." The instructions to Item 303(a) of Regulation S-K required that the disclosure in the Registration Statement to "focus specifically" on material events and uncertainties known to management that would cause Rubicon's previously reported financial information not to be indicative of future operating results, stating, in pertinent part, as follows:

> The discussion and analysis shall *focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results* or of future financial condition. *This would include descriptions and amounts of* (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) *matters that have had an impact on reported operations and are not expected to have an impact upon future operations*.

- 17 -

Case: 1:15-cv-03813 Document #: 52 Filed: 07/31/15 Page 19 of 37 PageID #:350

Thus, Item 303(a) essentially requires the registrant to disclose any change in the Company's business or environment that materially decreases the predictive value of the reported results.

(b)     Item 303(a) of Regulation S-K also required the Registration Statement to describe "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

(c)     Instruction 11(a) of Form S-3 required Rubicon to disclose "any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to security holders and which have not been described in a report on Form 10-Q . . . or Form 8-K . . . filed under the [Securities] Exchange Act [of 1934]."

(d)     Part I of Form S-3 required the Registration Statement to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

57.     In negligent violation of these disclosure obligations, the Registration Statement failed to disclose known material trends, events and/or uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's operating income, including: (i) Rubicon's material impairment of its inventory under applicable accounting rules and regulations because of its inability to sell certain of the wafers it produced at a prices greater than their cost to manufacture; (ii) its unexpectedly high development costs; (iii) the dramatic reversal of its trend of shrinking losses and potential return to profitability as a result of the material increases in development costs and inventory impairment charges; and (iv) that Rubicon was diverting financial resources to the incredibly speculative development of PSS samples despite having received no

- 18 -

material orders, all of which reflected a dramatic shift in financial results, making Rubicon's historical financial information not necessarily indicative of its changed business conditions.

58.     In negligent violation of these disclosure obligations, the 2013 Form 10-K incorporated by reference in the Registration Statement, also failed to disclose known demands, commitments, events or uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's liquidity, which, as illustrated in the chart in ¶55(b), caused a material change Rubicon's cash flows from operations during the 2014 first quarter as Rubicon engaged in increasingly speculative and costly development of PSS samples.

59.     These undisclosed material trends, events and/or uncertainties caused the reported financial information of Rubicon in the Registration Statement not to be necessarily indicative of the Company's future operating results.  In addition, the Registration Statement negligently failed to disclose these material changes in Rubicon's affairs occurring after the end of its latest fiscal year and significant known risks that caused the March 2014 Offering to be speculative or risky.

60.     On May 1, 2014, after the Company made public these previously undisclosed material demands, commitments, events or uncertainties, and changes in its affairs and risks, the price of Rubicon stock declined by more than 16% on very heavy trading volume.  On the following trading day, May 5, 2014, the price of Rubicon stock declined by another 5.9% on very heavy volume, as the market digested the Company's adverse revelations.

61.     Specifically, the Company issued a press release and hosted a conference call regarding its first quarter of 2014.  The Company reported disappointing financial results and the following previously undisclosed and materially adverse information:

(a)     **Reversal of positive trend of shrinking losses**.  The press release stated "costs in the wafering operations were high in the quarter resulting in an increase in pre-tax loss from $9.1 million in the fourth quarter to $10.9 million in the first quarter."  Thus, the Company

- 19 -

revealed that the trend of shrinking gross losses, operating losses, and losses per share from the prior quarters had dramatically reversed in the first quarter of 2014, reporting substantial increases in gross losses of $7.5 million, losses from operations of $10.9 million, and losses per share of $0.43.[8]

(b)     **Higher than expected development costs**.  The press release disclosed that "*[w]afer costs were higher than normal* due to the large number of PSS samples produced and the cost of establishing a four-inch polishing line."  The Company revealed that it was creating up to seven iterations of samples for its sixteen prospective PSS customers.[9]     The release quoted Weissman as stating these development costs were a "main cause of our negative margins." Although the Company had previously claimed that a reduction in idle plant costs would offset any PSS and 4-inch wafer developmental costs, in reality, those savings were far less than the increased development costs.  Whereas the Company reported revenues increased by $2.7 million from the fourth quarter of 2013 to $14.2 million in the first quarter of 2014, the Company's costs of goods sold increased by $4.4 million to $21.7 million for the first quarter of 2014.

(c)     **Inventory write-off**.  The press release also disclosed that the Company needed to write off $1.1 million in inventory "to align wafer inventory to market value."  During the earnings conference call on the same day, Parvez revealed that the Company was unable to sell wafers at prices above costs in first quarter 2014 resulting in "losses on wafer sales right now."[10] Later in the call, Weissman discussed the inventory write-off and admitted "*that amount was material*."

---

[8]     *See supra* n.5.

[9]     Rubicon had sent "multiple samples" to *nine out of sixteen* prospective customers in fourth quarter 2013 while its gross and operating losses decreased.  Thus, investors had every reason to believe that the Company's production of any remaining samples would not result in the dramatic increases in development costs in first quarter 2014.

[10]     During the earnings conference call, Parvez reported the inventory write-off as $1.5 million instead of $1.1 million.

- 20 -

(d) **Risky PSS business**. In disclosing the significant development costs in creating multiple iterations of PSS samples for *prospective* customers, the Company reported that PSS revenues were "minimal" as Rubicon continued to ship small volumes for qualification with no material orders. In fact, as the Company would disclose over a year later, the "minimal" PSS revenues noted on May 1, 2014 were a paltry $90,000. That was around half of the $171,000 in PSS revenues recorded in the fourth quarter 2013. An analyst on the call observed that the Company was taking "a lot of kind of risks" on behalf of the 16 prospective PSS customers. This risk was heightened by Weissman's admission that the Company had made "a strategic decision to take some of [the] core that [the Company] could easily sell if [it] wanted to and basically transform that core to PSS with the *hopes* that longer term [the Company would] be able to generate or create a PSS business." In other words, the Company was deliberately foregoing assured revenues from core to create samples for speculative PSS sales, which contributed to the decrease in cash flow from operations and increased losses from operations.

62. As a result, several analysts promptly reduced their price targets on Rubicon stock. The market likewise recognized the significance of Rubicon's adverse revelations. After the earnings call on May 1, 2014, the price of Rubicon common stock declined by 16%, from about $10 per share to $8.51 per share, on very heavy trading volume. On the following trading day, May 5, 2014, the price of Rubicon common stock declined by almost 6% to $8.01 per share, on very heavy volume, as the market digested the Company's adverse revelations.

63. In the two months following the March 2014 Offering, Rubicon's stock price fell to $7.01 per share, approximately 43% below the March 2014 Offering price paid to the funds controlled by Caldwell. In less than six months following the March 2014 Offering, Rubicon's stock price fell to $6.05 per share, over 50% below the March 2014 Offering price paid to the funds

- 21 -

controlled by Caldwell. The graph below illustrates the movement of Rubicon's stock price from the date of the March 2014 Offering to April 29, 2015:



64.     At the time of the filing of the original complaint in this action, the price of Rubicon common stock was down approximately 70% from the March 2014 Offering price, and was trading at approximately $3.93 per share as of April 29, 2015. By July 27, 2015, Rubicon common stock had fallen to approximately $1.91 per share.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons other than defendants who purchased the common stock of Rubicon pursuant to the Company's March 2014 Offering on or about March 19, 2014. Excluded from the Class are defendants herein, members of the immediate families of each of the defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any defendant has a controlling interest or which is related to or

- 22 -

affiliated with any defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

66.     The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is unknown to plaintiff at this time but the names and addresses of the Class members can be ascertained from the books and records of Rubicon or its transfer agent or the underwriters of the March 2014 Offering. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

67.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

68.     Plaintiff's claims are typical of the claims of the other members of the Class because plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

69.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

- 23 -

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the registration statement and prospectus issued by Rubicon to the investing public in connection with the March 2014 Offering negligently omitted and/or misrepresented material facts about the Company and its business;

(c)     whether the March 2014 Offering price of Rubicon common stock was artificially inflated; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

## COUNT I

**Violations of §11 of the Securities Act
Against All Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.  Plaintiff does not claim that defendants committed intentional or reckless misconduct or that defendants acted with fraudulent intent.

73.     The Registration Statement for the March 2014 Offering was misleading and contained untrue statements of material facts, omitted to state other facts necessary to make the statements made accurate, and omitted to state material facts required to be stated therein.

- 24 -

74. Plaintiff acquired Rubicon common stock pursuant to, and in reliance on, the Registration Statement, without knowledge of the untruths and/or admissions alleged herein. Plaintiff and the Class sustained damages when the price of Rubicon common stock declined substantially due to material inaccuracies in the Registration Statement.

75. Defendant Rubicon was the registrant for the March 2014 Offering. As such, Rubicon is strictly liable for the materially false and misleading statements contained in the Registration Statement and its failure to be complete and accurate. By virtue of the misrepresentations and omissions of material facts in the Registration Statement, Rubicon is strictly liable under §11 of the Securities Act to the plaintiff and the Class.

76. The Individual Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements in the Registration Statement misleading. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misleading representations and/or omissions of material facts. As such, the Individual Defendants are liable to plaintiff and the Class.

77. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to plaintiff and the Class.

- 25 -

78.     The defendants named herein were responsible for the contents and dissemination of the Registration Statement.  None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.  By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated §11 of the Securities Act.

**COUNT II**

**Violations of §12(a)(2) of the Securities Act**
**Against All Defendants**

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against all defendants.  Plaintiff does not claim that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

81.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Registration Statement and Prospectus Supplement.

82.     The Registration Statement and Prospectus Supplement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.  Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statement and Prospectus Supplement.

83.     Defendants owed to the purchasers of Rubicon common stock, including plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the

statements contained in the materials for the March 2014 Offering to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the materials for the March 2014 Offering as set forth above.

84.     Plaintiff and other members of the Class purchased or otherwise acquired Rubicon common stock pursuant to the defective Registration Statement and Prospectus Supplement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the inaccuracies and omissions contained in the Registration Statement.

85.     Plaintiff, individually and representatively, hereby offers to tender to defendants those securities which it and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their Rubicon common stock are entitled to rescissory damages.

86.     By reason of the conduct alleged herein, defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act. Accordingly, plaintiff and members of the Class who hold Rubicon common stock purchased in the March 2014 Offering have the right to rescind and recover the consideration paid for their Rubicon common stock and hereby elect to rescind and tender their Rubicon common stock to defendants sued herein. Plaintiff and Class members who have sold their Rubicon common stock are entitled to rescissory damages.

1060228_1

## COUNT III

### Violation of §15 of the Securities Act
### Against the Individual Defendants

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     This Count is asserted by plaintiff against all Individual Defendants.  Plaintiff does not claim that the Individual Defendants committed intentional or reckless misconduct or that the Individual Defendants acted with scienter or fraudulent intent.

89.     Each of the Individual Defendants acted as controlling persons of Rubicon within the meaning of §15 of the Securities Act by virtue of his position as a director and/or senior officer.  By reason of their positions at the Company, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised such power to cause Rubicon to engage in the conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.

90.     Each of the Individual Defendants was a culpable participant in the violations of §§11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Form S-3 and/or having otherwise participated in the process which allowed the March 2014 Offering to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding the plaintiff and other members of the Class damages together with interest thereon;

C.      With respect to Count II, ordering that the March 2014 Offering be rescinded;

D.      Awarding plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements; and

E.      Awarding plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  July 31, 2015                ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     JAMES E. BARZ (IL Bar #6255605)
                                     FRANK RICHTER (IL Bar #631001)


                                              s/ James E. Barz
                                     _____
                                           JAMES E. BARZ

                                     200 South Wacker Drive, 31st Floor
                                     Chicago, IL 60606
                                     Telephone:  312/674-4674
                                     312/674-4676 (fax)
                                     jbarz@rgrdlaw.com
                                     frichter@rgrdlaw.com

                                     ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                     SAMUEL H. RUDMAN
                                     58 South Service Road, Suite 200
                                     Melville, NY  11747
                                     Telephone:  631/367-7100
                                     631/367-1173 (fax)
                                     srudman@rgrdlaw.com

ABRAHAM, FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)
jfruchter@aftlaw.com

Lead Counsel for Plaintiff and the Class

1060228_1

CERTIFICATION OF FIREROCK GLOBAL OPPORTUNITY FUND LP
IN SUPPORT OF CLASS ACTION COMPLAINT

FIREROCK GLOBAL OPPORTUNITY FUND LP ("plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions in the stock of Rubicon Technology, Inc.   See Attachment A:

5.    During the three years prior to the date of this Certification, Plaintiff has sought to serve as a representative party on behalf of a class in the following actions filed under the federal securities laws:

   *Firerock Global Opportunity Fund LP, et al. v. Castlight Health, Inc., et al.*, No. CIV533203 (Cal. Super. San Mateo County)

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.   Executed this 29th day of April , 2015.

FIREROCK GLOBAL OPPORTUNITY FUND LP

ATTACHMENT A

| Date | Action | Amount | Price |
|------|--------|--------|-------|
| March 19, 2014 | Buy | 1,000 shares | $13.00 |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 31, 2015.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

E-mail: jbarz@rgrdlaw.com

1060228_1

# Mailing Information for a Case 1:15-cv-03813 Firerock Global Opportunity Fund LP v. Rubicon Technology, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Carlos Barros**
  mheffner@heffnerhurst.com

- **James E Barz**
  jbarz@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **John F. Batter , III**
  john.batter@wilmerhale.com

- **Gregory David Chisholm**
  gregory.chisholm@wilmerhale.com

- **Lawrence P Fogel**
  lawrence.fogel@sidley.com,efilingnotice@sidley.com

- **David Andrew Gordon**
  dgordon@sidley.com,efilingnotice@sidley.com

- **David F. Graham**
  dgraham@sidley.com,efilingnotice@sidley.com

- **Matthew Thomas Heffner**
  mheffner@heffnerhurst.com,mhurst@heffnerhurst.com

- **Mark Stuart Hersh**
  mhersh@reedsmith.com

- **Peter J. Huh**
  phuh@reedsmith.com,knielsen@reedsmith.com

- **Seth A. Moskowitz**
  seth.moskowitz@wilmerhale.com

- **Brian O O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`